I have pleased the court to fly in for the plaintiff appellants, the Tang family. Your Honor, this is the case in which Mr. Tang was taken into police custody and rendered brain dead after approximately an hour and a half in police custody. There are five separate grounds on which the trial court made errors and should be reversed with respect to Westminster. Westminster itself agrees that the trial court instructed the jury on the wrong legal standard with respect to the state's deprivation of medical care in custody. The court instructed on gross negligence rather than the ordinary negligence standard under Government Code 845.6. Second, with respect to the autopsy photos, the main issue in the case was essentially whether Mr. Tang died of blunt force trauma or cocaine intoxication. The trial court admitted only the photos showing the external superficial injuries to Mr. Tang and excluded all of the photos that tended to show internal severe blunt force trauma to Mr. Tang. And the photos supported only the police version of the events and the exclusion of the severe injury photos contradicted the Tangs version of the events. The third reason is that with respect to time, both parties submitted in the joint pretrial order that the Tangs would need 15 days to try the case. The police would need five days to defend the case. That was after the parties already cut the case down from a 20- to 25-day estimate. Nonetheless, the court gave the Tangs only three and three-quarter days to put on a case with 30 witnesses, including 10 experts, leaving us an average of 26 minutes per witness. And then finally, one juror admitted that most of the jurors considered the fact that defendant jailer Chris Duong was also Vietnamese, the same race as defendant Tang. That was a primary factor in their decision to reach a verdict in favor of the police. The jury foreman then told a newspaper reporter that Chris Duong, the jailer, the Vietnamese jailer, was the key witness that caused the jury to side with the police. And under Henley and Dyer, if even one juror is suspected of having made the decision based on race, then the Constitution requires the court to interview the jurors to determine whether or not they did in fact consider race. That issue is raised. The court conducted no interview of any of the jurors, and that was a constitutional error that requires reversal. Those are the five reasons for reversal with respect to Westminster. Each is independently sufficient. Actually, the fifth one was the failure of the court to take judicial notice of its order that the police preserve the felony cell shower drain. There was an imprint of that drain in two places on Mr. Tang's back. Before the trial, the police admitted that for an hour they grounded down with a Makita high-speed hardened steel drill brush, scraped off all the markings on the surface of the drain that corresponded to the markings on Mr. Tang's back. And then the court refused our request to allow us to comment that the police had been ordered to preserve the drains and then did not. And credibility was, of the police, was a critical issue because there were five police with Mr. Tang. And since he was dead, we lost our witness to the actual physical abuse. The hard part of this case, for my purpose, I don't speak for my colleagues, is the argument that for you that seems to me the strongest is the error in the jury instruction. But the hard part of that argument, from your standpoint, seems to me waver. Why didn't you waive that objection? You know, at some point you say no objection. I mean, it's a pretty tangled business. It seems to me far from clear that you simply said, you know, gross negligence is not the standard. Negligence isn't the standard. Here's the instruction I want, objection. Why didn't you waive? Well, because we did all those things. The jury was instructed on a Tuesday morning. On the Friday before that, we had a jury instruction conference. And at the conference, I explicitly stated to the judge that under 845.6, the standard for negligence is ordinary negligence for deprivation of medical care and not gross negligence. We then, on the following Monday morning, submitted a five-page brief citing about ten different cases, interpreting 845.6 to the court. The court acknowledged the receipt of the brief. The defendants acknowledged the receipt of the brief. It explained the standard was ordinary negligence. And then at the same time, we submitted a written jury instruction. Admittedly, that instruction, this was to replace instruction, I think it was number 34, that was the state standard. The first paragraph, we deleted the word gross. In the second paragraph, I inadvertently left the word gross in the instruction. The court commented that that was internally inconsistent and it didn't say what I wanted it to say. But this was at the same time that we had submitted a five-page brief on precisely that issue, after also having raised it on the record at the jury instruction conference. So the court knew that that was a typo and then just refused to strike out the typo and instead gave the wrong instruction. And then clearly the jury relied on it because then four days later, on the third day of deliberation, they came back with a written question to the court, could you please define gross negligence for us? And again, the court instructed them on gross and, you know, we said that we had briefed that issue, it was the wrong standard, and that the court had rejected that argument. And the court again said. And did you then say no objection? That was in response to the court's question, am I reading a correct definition of gross negligence? The answer to that was yes. It was out of the Calgic booklet and it was the correct instruction. It was the correct definition of gross negligence, but we had objected that that instruction should not be given. And we told the court, we briefed that issue, it was the wrong instruction, and the court had rejected that argument. Okay. Now, assuming that it's not waived, assuming that there was sufficient objection, what standard do we use to address harmlessness? The standard is whether or not the jury relied on the instruction and whether or not the evidence otherwise would have supported a verdict in our favor. Yeah. The difficulty I have in a way with this case is that you really didn't try it based on negligence. You tried it, you know, your argument was they beat this guy up. Well, regardless of that, he was probably survived. Our argument was that they beat him up in the first 20 minutes, that he got there, but then the actual cause of death was that he went into seizures, and these seizures are a moderate seizure for about 45 minutes where they're alternating off and on, and then after that they go into terminal seizures where the brain damage becomes irreversible. Our argument was that they had observed him having seizures where his back goes into a full arch, which they described about 20 minutes after he got there, and they watched those seizures happen for about an hour before they called paramedics, when they finally realized he was going into the terminal stage electrocution-type seizures, when at that point he was irretrievable. But the medical testimony was that before the electrocution-type seizures, he's retrievable, and that they watched him having those seizures for about 40 minutes. So, yes, the blunt force trauma triggered the seizures, but he was retrievable for at least 45 minutes after that point. So, if we had had an instruction that they were negligent in failing to call the paramedics, that was a major part of the case, that they had waited all this time. And actually, that ties in to the amount of time we had to try the case, because the police were defending that Twan was occasionally speaking during that 45-minute period, that he asked for water, that he took part of a, he participated in part of a drug evaluation by Officer Gensler, and then after he'd been in custody 40 minutes, when the blood tech came to draw his blood, that he actually said to her, my handcuffs are too tight. Because we were short on time, we didn't have enough time to elicit Officer Dwan's testimony that Twan was nonresponsive and didn't say anything when the blood tech came, that Officer Gensler did not hear Twan ask for water, that Lieutenant Schliske did not hear Twan ask for water, even though they were in the jail cell at the same time. So the case was tried and actively defended on this issue of how responsive Twan was, how much did he speak and what did he say during that 45-minute period where we contend that he was still retrievable. And how would you have put that evidence on had you had time to do so? We had a 225-page deposition from Officer Dwan, and similar depositions from Officers Gensler and Lieutenant Schliske, where they directly contradicted each other. For example, Officer Dwan did not hear Twan say anything. I guess what I'm after is not so much what evidence you had, but I'm trying to figure out, in the time available to you, this sounds like important evidence. Why didn't you put it on? You would have had some warning that they were going to say, we heard him say this, so why did you make a decision not to put it on? Why was the evidence you put on more important than this and excluding this? Well, there was a lot of evidence that was important. For example, there was evidence we asked Officer Dwan to describe Twan's body posture at various times and how long it took the police to get him into the restraint chair. That was a key issue because the police admitted the only time Twan was out of the restraint chair when we contended that he had been beaten was for the first five minutes that he was in police custody. The transcripts of the radio calls show that Twan was placed in the restraint chair, fully restrained, immediately before the police had to leave and go on a suicide call. The time of the suicide call was 1140. That was 30 minutes after Twan got there, so I had to spend time. I only had six pages of deposition. I only had time for six pages with Officer Dwan, and I had to ask him about the 30-minute discrepancy in his time estimate. I had to ask him to describe Twan's fully arched back at the time they were trying to put him into the restraint chair. That puts him in a seizure within 20 minutes after his arrival at the police station, so that was critical. Toward the end of the football game, the clock is running down. One team wants the clock to put in four plays. The other team wants zero. Was he answering slowly? I'm trying to figure out the dynamic and how much actual prejudice there was. You've got lots of evidence to put on, but I'm still not to the point of understanding why you... If it's important to you, did he say anything? That's a quick question to ask and then to answer. Yes, he said that Twan was speaking at the time of the ask for water. He claimed that... But you say you've got evidence from somebody else that says that he wasn't. No, I'm saying I had it available. My question remains, okay, I understand why you wanted to get this on, but if it's important that he said nothing, it doesn't take you very long to put somebody on the stand to say, no, he said nothing. Well, the thing is, there were some officers saying he would say it at one time. I mean, I had no time. This was a 15-day case put into three and three-quarter days. So what I'm saying is I put on key evidence about... I did talk to him about speaking, but I didn't have time to fully impeach him. And I understand it's very easy for me to say, Monday morning quarterbacking, to continue the metaphor of you could have, would have, should have, but, of course, in the middle of that, it's unclear precisely what's going to prove to be critical, and given more time, you would have put it on. Did you ask for more time? Well, no, because the judge repeatedly said every time he gave us the time estimate, don't even bother to ask. I'm not going to give you any more time under any circumstances. And Westminster quoted in their brief where the judge said, you know, I just want to make it clear that, you know, you've used up... you're using up your time, and I want to make clear it's your fault and not mine. But it wasn't our fault. We took 65 depositions in that case. We nevertheless cut our witnesses down to 30, and we were given one-quarter the time we needed to try the case. We did tell the court at the pretrial conference when the issue first came up, there's no possible way we can do this in less than 15 days. And then the court nevertheless ordered 3.75 days and repeatedly said, don't even ask for more time because you're not going to get it. I mean, it would have been futile. It was clear it would have been futile. Well, you know, sometimes when you have a fixed period of time, then you, you know, you have to decide what you're going to put on and not put on testimony that's repetitious. And for experts that are going to testify to basically the same thing, you pick and choose and you cut it down. And many times you can have a much more effective and persuasive case. Your Honor, we cut the case to the bone. Well, I don't know whether you cut it to the bone or not. You know, I used to limit time and trials when I was on the district court. And, you know, there were certain complaints, but in every instance that I can recall, both sides finished early. Well, it was 30 witnesses with 10 experts and we were given three and a half days. Maybe you didn't need 10 experts. Well, only half of those were ours. The other half were the defendants. Well, they used up their time, yeah. Okay, but we need to cross-examine them, and that was counted against our time. Yeah. There were complex issues as to what his condition was before. I mean, there were other issues, for example, Lieutenant Blackburn had taken tape recordings of the entire incident. Those tape recordings were destroyed, so there was discussion about that. There was discussion about the timing of how long it took, you know, Twan to be placed into the restraint chair, what his observable symptoms of seizure were. All that testimony was absolutely essential, and when you have an average of 26 minutes per witness, there's physically not enough time, particularly, and I discussed it in the brief, one out of every four questions that the police answered required impeachment. They were saying opposite of what they were saying in the trial. That consumed approximately 25 to 30 percent of the total testimony time of the police, so they gained a strategic advantage by testifying inconsistently. So it left, it was a question of either do I impeach them or do I elicit substantive evidence, and I did make conscious, deliberate decisions about how best to use the time. The time was physically impossible to get, to simply read the testimony that was necessary to impeach them, and that was critical because my key witness was dead,  and there's another ground for reversal, and that is that the jury admitted they considered the race. They admitted, they thought that because the jailer, Chris Twan, was Vietnamese, he would not allow another Vietnamese inmate to be beaten or medical attention to be withheld. Juror Medina told me that. I submitted that in a declaration to the district court in the motion for new trial, and under Henley and Dyer, the Constitution required the district court to call in the jurors, at least Ms. Medina and the foreperson who had said to the, who had made a report to a reporter in the newspaper that Twan was the key witness. The trial judge had a duty constitutionally to call them in and say, did you consider the race? And his failure to do that prevents this court from determining whether or not race was a factor. So on that ground alone, the case needs to be reversed and remanded for a new trial. All right. You're beyond your time now, but I'll give you a little bit more. Thank you, Your Honor. Very briefly, with respect to the Orange County Fire Authority, the court denied summary judgment for the police on the identical issue that it granted summary judgment for OCFA, and that was that when OCFA received a drug call, they had a practice of calling the police to back them up for the purpose of investigating illegal use of drugs. So the police would walk into the residence, as they did in this case, no knocking, no announcing, no warrant. They just walked into the house and arrested Twan Tang in violation of the Constitution. Based on this practice that Westminster Police Chief testified, OCFA has a practice of calling the police to back them up on drug calls. The court denied summary judgment as to the police because that practice raised a question of fact of illegal entry, but it granted summary judgment to OCFA on the identical practice. So OCFA should also be reversed and remanded for trial as to OCFA on that same issue. All right. Good morning. May it please the Court. I'm Pete Ferguson on behalf of the City of Westminster Defendants. I'm also with me is my co-counsel, Jewel Zeman, who represents Orange County Fire Authority, and I request the timekeeper give me five minutes before my time to reserve for Orange County Fire. Well, you keep track of the time. I think the case management issue first is extremely important to understand what was going on in the dynamics of this whole case. It started really before the trial began when the district court wanted to know what all the issues were going to be, what were the elements of those issues, how long it's going to take. And in fact, two days before the trial at a pretrial conference, the court asked, this length of time, I'm not going to give you the 15 days, and you've got to par this case down. The court stated specifically, I'm not going to prevent you, I'm not going to commit an error of due process and not let you put substantive evidence on, so what evidence do you need to put on that you think you need more than the four days I'm going to allow you? And counsel started explaining the kind of evidence he wanted to put on, and the court stopped him after he made a statement, and I need to impeach these witnesses with all of their inconsistencies. And the court, in fairness to the court, in keeping its own docket sheet and broad discretion in limiting what's to take place in the trial, said, I'm not going to allow all these little inconsistencies to come into place because it's not relevant. And the court made a nice analogy, you can paint a picture, but I'm not going to let you put in all the little birds and all the colorful clouds. Put the case on, and you can do that. What do you need to do? Why do you need more time? And nothing was presented at that time. How much time was requested and how much time was given? It had changed dramatically at the pretrial conference and another pretrial hearing and then just before trial. I think plaintiffs wanted 10 days, and I obviously would say 10 days. If he said five, I'd say five. If he said 100, I would say 100. That's what a good trial lawyer does. The trial judge says, I'm going to give you the two week period of time. Two week in trial time for the district court. Starts on Tuesday, ends on Friday. One week, the next week starts on Tuesday and ends on Friday. And that's how the time was going to be summed up. I don't know, I thought 1,325 minutes per each side in the court. The court did every day tell each side how many minutes were used, how many minutes are remaining. And constantly was telling the plaintiffs, I'm going to warn you, you had a witness on a very long period of time. You need to move. They count against each party the cross-examination that they do of the other party's witnesses? I'm sorry, Your Honor. Cross-examination is counted against your time. Absolutely, Your Honor. I've never heard that before. If they put on a witness and plaintiff has 20 minutes with the person and cross-examination is 15 minutes, it's 20 for the plaintiff and 15 for the defendant. So it's summed up all the way along. So each day, at the end of each day, each party had used minutes. So during the plaintiff's case, some of the time is your time. My time is zooming along just as fast. I need to work just as fast as the plaintiff does to put on my case as well. These issues about let me just move to the next issue. The jury instruction is a very important issue here. And you've got to keep it again, once again, in context of how this case arose. Again, before pretrial, the court stated, what are your issues and what are the elements of each issue? Ask the plaintiff what the issues are. He didn't know all of the issues he wanted to present at trial. He didn't know all of the elements at a trial. And at the end of every day, or almost virtually at the end of every day, the court said, please submit briefing to me. Tell me what your elements are. Tell me what the issues you're going to present and tell me so that I can prepare the jury and jury instructions as we're moving along throughout this trial. The first day of trial, the plaintiff dismisses the state assault and battery claim because he now realizes it's really virtually the same as a Fourth Amendment excessive force claim. He dismissed the entry claim and he dismissed the false arrest claim. What really remained was really excessive force and denial of medical attention. There we had the federal standard, Estelle v. Gamble standard, 14th Amendment, that the jury found was not denial of medical attention. Plaintiff didn't know what the elements were. And that's important for this court to understand. The plaintiff didn't know what the elements were of his gross negligence claim. The court asked him, are you having a state cause of action for gross negligence? Counsel says yes. Not until the jury instruction conference, and it's important how this comes up, did plaintiff finally, the lights start going off, sort of. Because we first went through all of plaintiff's proposed instructions. Plaintiff put on all of his objections, the court allowed him all the time in the world, not one word about this instruction of gross negligence. Not until we were getting into defense instructions and I was laying objections and I was making arguments to what I believe were appropriate and proper instructions to the court, did we get into the state claims of negligent infliction of emotional distress and I said I wanted an instruction on discretionary immunity under California Government Code 82815 and set. And plaintiff brought up at that time, at that context, this gross negligence thing, negligence standard. So it wasn't a big flag going up in front of the court saying, judge, I made a mistake, I don't mean gross negligence even though I said it all along, I mean a negligence standard. He didn't say that. That didn't happen. Not until the day before the jury's instruction he submits this brief. Still not saying a big flag, I made a horrible mistake, we need to fix this, and by the way, here's a way to fix it, here are my proposed instructions. Didn't do that either. Not until ten minutes before the jury is to be instructed they walk in, does he raise it for the first time and he gives the court some proposed instructions. And the record's very, very clear. The court said it's not timely and it's an inappropriate standard anyway. Now, is the court wrong on that second point? Was it an inappropriate standard? It was an inappropriate standard, or the instruction, or the proposed instruction, even if you marked out the word gross, and it had the word negligence, as plaintiff, the appellant would appreciate, it still did not have the state standard of 845.6. The instruction needed that. It's not there. It's just, were the defendants negligent in not providing immediate medical attention? That's not enough. You have to have an instruction that there was objectively, that the officers objectively knew or should have known of immediate medical attention and they failed to provide immediate medical attention. That's what the instructions needed to be presented by the plaintiffs to the court. So that's waived. I believe it's all waived. But then again, let's look what the instructions were given. And I made a mistake. I shouldn't say that too loudly. An instruction was given, 22, 23, and 24. I think they're attached to the briefs. These instructions first came in when I submitted my first packet of proposed jury instructions. I think I had three packets totally that I had submitted when plaintiffs never submitted a full packet except near the very end, and it was partially submitted to the court. And in that packet, I'm looking at this case, and I don't know where plaintiff is going in this case. He doesn't even know what all of the issues are. It's hard enough for the district court. It's even harder enough for me to understand where this case is going to go. Plaintiff didn't submit anything on gross negligence. I submitted a proposed instruction on the deliberate indifference standard. I took the Ninth Circuit model, deliberate indifference standard. They still gambled. That's for the federal claim. That's the federal claim. But if you look at the federal Ninth Circuit model jury instruction, the last paragraph is omitted. So it's a modified instruction. It just says, deliberate indifference to provide medical attention. But what deliberate indifference is, is omitted from there. The court took that out. Then, and in place, jury instruction 22, 23, and 24 were submitted for the context of what that meant. And in there, difference between state law and federal law, federal law is just a subjective requirement. State law is the objective standard. It's there. Jury instruction 22 specifically says, did the officers know or have reason to know that the prisoner was in need of medical attention? And they did. That there was no deliberate indifference to provide medical attention. They used that very standard that is state law. That language comes specifically out of Government Code Section 845.6. It specifically is talked about in the Watson v. California case. And it's specifically talked about in Lucas v. County of Los Angeles, where the California appellate court brought this up as an issue. But that's not the case here. Our case... Let me see if I understand your argument. You're arguing that in giving instruction number 22, which explains what is meant by deliberate indifference, you, by mistake, define deliberate indifference essentially as the state law negligence standard. Absolutely. I put the state law standard there in context of... Is this then basically a harmless error argument, that the instructions considered as a whole essentially gave pretty much the instruction that he should have asked for but did not? I mean, I'm trying to figure out your argument. Absolutely. That's the argument. On the other hand, if that's your argument, deliberate indifference really is quite a different phrase from this, knew that was a complete cure, but I understand the argument. Okay. As to the photographs, the photographs of internal organs lying on the table or body parts opened up, autopsy photographs, were all reviewed by the district court. The court looked at them. The court said and made a finding, these are awfully gory instructions. Counsel even admitted very gory instructions. And the court held a 403 determination and said, if there at a time becomes a conflict in the testimony where only the photograph can be used as a judge of a fact, then bring that up and then I'll reconsider that issue. Never again was it brought up by the appellants as an issue and I believe it was just waived at that point. And I think the court did not abuse its discretion in conducting that 403 hearing and balancing the test to omit those gory basically autopsy photographs. The jury misconduct or the racial context. Now the district court excluded the jury the juror's statement that was in the local newspaper and held that it violated 606B because it went to the heart the statement went to the heart of jury deliberation. Now 606B has to have a reason and it's just not completely ignored just because a racial or some allegation of misconduct comes into place. But understanding the constitutional effect of how that should play, I think you have to look maybe at the statement itself. Now in the skillet case, there was a juror's statement that in a criminal case where it was an African-American defendant raped a white 17-year-old girl and a jury said we know that kind of what happens. Now that's a racially charged statement. That's inferring a racial prejudice on its own, on its face, standing by itself. There then there might be some requirement that we got to look at something. In this case the jury said well our deliberative process we as a juror thought in deciding and deliberating how could a Vietnamese jailer, a police officer, have done anything against a Vietnamese prisoner. Now that's not a racially charged statement. But it's certainly racially based. Charged may be the key word in your statement. It's certainly racially based. The defendant was raped. Yeah. It shows that the decision making is for racial purposes. But how is that negative toward the decedent? Doesn't that show just the opposite? Doesn't that show somebody of the same race is going to be compassionate, is going to be, is going to not allow misconduct occurring? It's going to be just the opposite of what the plaintiffs want it to be. Yeah. It takes a proposition which people may believe in or not believe in. I mean it may not be true that people of the same race are going to be compassionate if they see a criminal of their race. But that's how it was applied in this case. But it's obviously being applied against the plaintiff. And it may or may not be true that a Vietnamese police officer would or would not take care of a Vietnamese in some different way from the way you would take care of a black or a Caucasian or whatever. And it equally could have been applied the opposite. It equally could have been well because he is Vietnamese. He now being the jailer or the decedent. And he's a police officer. Or he's just a police officer. I'll put the context of just the police officer. And the victim is Vietnamese. Now that's a racial, that's a racial, everything is racial when you have a minority who's involved in a situation. So again you can't look at it in the vacuum. You've got to look at it for what it is. I don't think he comes, I don't think the decisions allow him to even come beyond the 606B requirement. But Westminster has a large Vietnamese population does it not? Huge Vietnamese population. You have Vietnamese police officers, jailers and Is that where Little Saigon is located? Little Saigon is right there. If there are any other questions I'll give the rest of my time up to Mr. Zeman. Thank you very much Your Honor. Good morning Your Honors. Jewel Zeman on behalf of the Fire Authority Defendants. The only issue that is before the court as to the Fire Authority judgment granted by the District Court. It's our respectful contention that the District Court correctly decided that and that there was no inconsistency between its ruling that the Westminster Police Department summary judgment on similar grounds should be denied but that the Fire Authority summary judgment should be granted. The only question relating to the Fire Authority was whether there was anything unconstitutional or in order to promote safety and security for the paramedics while performing their tasks for the public when they had a report from in this case family members that the family member for whom they were to perform their services was violent, was acting crazy, was hallucinating and was under the influence of drugs. It would be our contention that as a matter of law under those circumstances a policy of calling for police support is not unlawful, is not violative of any part of the Constitution whatsoever. If the rule were otherwise there would be an unwanted chilling effect certainly on the provision of paramedic services for the public. The question as to the Westminster Police Department which existed at the time was whether or not there was a warrantless entry and that issue did not pertain to the Fire Authority. They came, they performed their services, they were told that they weren't needed and they left. It's my understanding that there's no case in the entire country that would hold paramedics liable under 1983 or Monell claim for having a policy of promoting safety when they're asked to report to a scene where there's been criminal activity or where there's been a violent individual for whom they have to perform services. I'd be happy to address any questions the Court may have and if not, if Mr. Ferguson would like more time I would prefer to move on. Thank you, Your Honor. He's resting up. All right. We'll give you a minute or so for rebuttal. Your Honor, Westminster concedes that the jury considered the race as an important factor in reaching their conclusion and under Dyer and Henley the case must be reversed because the district court did not conduct an inquiry, an interview of the jurors to determine whether or not race was a factor. Did you put in any affidavit from a juror? No, I had to use my own declaration of what the juror said because the attorneys have no ability to subpoena jurors so the only way it can get before the court is through the attorney. And did you ever speak to a juror? Yes, I spoke to Juror Medina. I spoke to about three of them. Juror Medina said the majority of the jurors thought that because Officer Duong was Vietnamese that he would not allow a Vietnamese inmate to be beaten or injured specifically. And did the jurors, were they unwilling to provide affidavits? I didn't ask. See, that's not too smart to go interview the jurors. You know, are you going to get up out of the stand and testify? Yeah. What are you going to do? I mean, in the usual state, they're not going to sign a declaration. Well, I mean, usually what's done is send an investigator over there, talk to them, get a statement from them. Let me ask you something. Aside from the statement that was made, is it inappropriate to conclude that people sitting on a jury, minorities, whatever they are, or even people that are not a minority, if they see a case concerning police misconduct and they are of the same race or ethnicity of the plaintiffs and they see someone in the police force that's of their ethnicity or race, without saying anything, do they have a right to consider that in determining whether or not the testimony of the police, of the plaintiff, is true or false? It's not a consideration that people ordinarily would take into consideration. If you're black, if you're white, if you're nationality, if you're Norwegian and are Norwegian plaintiff claims they were beaten up and they're Norwegian, there's a police officer who's Norwegian who was there. Is this something that in the whole panoply of decision-making people, while not articulating it or not relating it to a racial decision, would have as part of the makeup of their decision-making? I think that might vary from case to case, but in most cases it would be a minor factor relative to the evidence and it could go in either direction. But as a matter of judicial policy, it must be the policy of the courts and public policy that jurors cannot consider race as a significant factor in reaching their decision. And in this case, the juror made it a whole, not just her. The jury as a whole reached their decision. That was further corroborated by the foreman of the jury telling a reporter, knowing it would be published in the paper, that that particular officer, Officer Duong, was the key witness in the entire case. And to the extent we spent a lot of time in our history trying to get people not to see race as a key witness, he didn't say anything else, did he? No, he didn't specifically say race, but in the context of Juror Medina saying that Duong, his race was a primary factor for the jurors in reaching their decision, there's enough of a connection there for the court to inquire if the foreperson was race a factor, particularly when Juror Medina attributed it to the jury as a whole. Tell me again what you presented to the judge, Judge Taylor. It was my declaration that Juror Medina had stated to me that the Vietnamese race of Officer Duong was a primary consideration in the jury's decision in favor of the police because they did not believe a Vietnamese officer would allow a Vietnamese inmate to be beaten or deprived of medical care. And my declaration went on to say that the jury foreperson had told a newspaper reporter that Chris Duong, the Vietnamese jailer, was the key witness in the entire case, but the newspaper report did not refer to the race. But is that a consideration that jurors would take into consideration in any event? Matter of fact, that's the reason why we have affirmative action, putting black minorities on police forces so that the minority population feels they have some affinity and understanding and compassion concerning the police department. That's the reason they put the minorities on the bench. They want the public to feel decision-making is even-handed. And so why would it be inappropriate for a juror to see, well, there was a Vietnamese policeman there and they can't be beating him up because he's Vietnamese? Well, if they ever found out that a judge was making decisions based on the race of the parties in front of them, those decisions would be undone and reversed. And here the jury explicitly stated that a primary factor in their decision was the race itself. You know, and it's enough to trigger the inquiry. I mean, you can see it raises an issue. Well, was this, did they just recognize they happened to be of the same race? And there's no way to predict on an evidentiary basis whether or not that has any evidentiary value. It's a total arbitrary factor. But here the jurors went on and said this was a primary factor in reaching our decision. At that point, the court has a constitutional duty to make an inquiry, was this a factor that affected the outcome of the trial or not? And the failure to conduct the inquiry was the error. Was it your plan to, I'm just curious, your plan to impeach each police officer with all the inconsistencies that you thought existed, comparing his or her oral testimony with the deposition testimony? No, there were key officers and key discrepancies. There was Officer Gensler stating that Twan gave him certain verbal responses on the drug evaluation. Officer Duong, the jailer, was present at that time. He said he didn't hear Twan say anything in response to Officer Gensler. Then there was Duong saying Mr. Tang asked for water at the time when Lieutenant Schliske was supposedly in the cell. Lieutenant Schliske did not say that I heard Twan ask for water. Then there was the blood text saying Twan told me his cuffs were too tight, but there was Officer Duong saying... Were all those officers, they were sued here? Yes. I did that with respect to all the issues, but I was physically out of time and I limited myself to six, eight, ten pages per defendant in some cases. This was not enough time to even read the key testimony. If I had had the opportunity to stand up there and just read to the jury the key testimony and the key discrepancies, there was not physically enough time to do it. We're going to take a short recess. ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...   ... ... ...
judges: Pregerson, Cowen, W. Fletcher